In re Eugene TELFAIR, Debtor.

Eugene TELFAIR, Gail E. Telfair, and
All Other Person Similarly
Situated, Plaintiffs,

v.

**FIRST UNION MORTGAGE
CORP., Defendant.**

Bankruptcy No. 92–12162.
Adversary No. 97–01064A.

United States Bankruptcy Court,
S.D. Georgia,
Augusta Division.

Aug. 26, 1998.

Mr. John B. Long, Angela C. McElroy, Augusta, GA, for plaintiff.

Wm. Byrd Warlick, Warlick, Tritt & Stebbins, Augusta, GA, Mark C. Treanor, Russell J. Pope, Treanor, Pope & Hughes, Towson, MD, for defendant.

## ORDER

JOHN S. DALIS, Bankruptcy Judge.

The plaintiffs, Eugene and Gail Telfair, moved for class certification on two causes of action brought in this adversary proceeding, regarding the defendant's, First Union Mortgage Corporation ("First Union"), application of postconfirmation plan payments to attorney fees and expenses and First Union's force placing of the Telfairs' insurance.[1] First Union moved for summary judgment in response. First Union's motion is granted and Mr. Telfair's motion is denied.

Federal Rule of Bankruptcy Procedure 7056 incorporates Rule 56 of the Federal Rules of Civil Procedure. Under Rule 56, this Court will grant summary judgment only if "... there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party has the burden of establishing its right of summary judgment. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir.1991). The evidence must be viewed in a light most favorable to the party opposing the motion. See Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970).

Eugene Telfair and his wife obtained a Veteran's Administration ("VA") guaranteed loan in 1984 from First Union's predecessor in interest. As part of the loan, Mr. Telfair and his wife executed a VA form Security Deed[2] granting a security interest in their residential property in Richmond County,

---

1. I determined at the hearing on class certification that Gail Telfair is an inappropriate class representative and plaintiff in this proceeding because she was not a debtor in the bankruptcy case.

2. The Security Deed provides in relevant part:

2. Together with and in addition to the monthly payments of principal and interest payable under the terms of the note secured hereby, he [Grantor] will pay to the Grantee as trustee (under the terms of this trust as hereinafter stated) on the first day of each month until the said note is fully paid, the following sums:

(a) A sum equal to the ground rents, if any, next due, plus the premiums that will next become due and payable on policies of fire and other hazard insurance covering these premises,

Georgia. Pursuant to the Security Deed, First Union required the Telfairs to place in escrow an amount to pay insurance, taxes and other costs. Paragraph three of the Security Deed refers to this account as a "trust" and to First Union as the "trustee." In 1988 the Telfairs failed to provide proof of insurance on their property. At that time First Union "force placed" the insurance by substituting an insurance company from whom First Union receives commissions for obtaining insurance business, instead of us-

ing the insurance company the Telfairs previously used for coverage of their home. The new company, Balboa Insurance Company ("Balboa"), charged higher premiums than the company the Telfairs had used. Mr. Telfair claims he did not receive notice of his lapsed insurance and the force placing to Balboa by First Union. Balboa continued to insure the Telfair's property until after Mr. Telfair's bankruptcy filing. The Telfairs obtained their own insurance with State Farm as of March 31, 1998.

plus taxes and assessments next due on the premises covered by this Security Deed (all as estimated by the Grantee, and of which the Grantor is notified) less all sums already paid therefore, divided by the number of months to elapse before one month prior to the date when such ground rents, premiums, taxes and assessments will become delinquent, such sums to be held by Grantee in trust to pay said ground rents, premiums, taxes, and special assessments.

(b) The aggregate of the amounts payable pursuant to subparagraph (a) and those payable on the note secured hereby, shall be paid in a single payment each month, to be applied to the following items in the order stated:

(I) ground rents, taxes, special assessments, fire and other hazard insurance premiums;

(II) interest on the note secured hereby; and

(III) amortization of the principal of said note.

Any deficiency in the amount of such aggregate monthly payment shall, unless made good by the Grantor prior to the due date of the next such payment, constitute an event of default under the Security Deed. At Grantee's option, Grantor will pay a "late charge" not exceeding four per centum (4%) of any installment when paid more than fifteen (15) days after the due date thereof to cover the extra expense involved in handling delinquent payments, but such "late charge" shall not be payable out of the proceeds of any sale made to satisfy the indebtedness secured hereby, unless such proceeds are sufficient to discharge the entire indebtedness and all proper costs and expenses secured thereby.

3. If the total of the payments made by the Grantor under (a) of paragraph 2 preceding shall exceed the amount of payments actually made by the Grantee as trustee for ground rents, taxes, assessments, or insurance premiums, as the case may be, such excess shall be credited by the Grantee on subsequent payments to be made by the Grantor for such items or, at Grantee's option, as trustee shall be refunded to Grantor. If, however, such monthly payments shall not be sufficient to pay such items when the same shall become due and payable, the Grantor shall pay to the Grantee as trustee any amount necessary to make up the deficiency. Such payments shall be made within thirty (30) days after written notice from the Grantee stating the amount of the deficiency, which notice may be given by mail. If at any time the Grantor shall tender to

the Grantee, in accordance with the provisions of the note secured hereby, full payment of the entire indebtedness represented thereby, the Grantee as trustee shall, in computing the amount of such indebtedness, credit to the account of the Grantor any credit balance remaining under the provisions of (a) of paragraph 2 hereof. If there shall be a default under any of the provisions of this Security Deed resulting in a public sale of the premises covered hereby, or if the Grantee acquires the property otherwise after default, the Grantee as trustee shall apply, at the time of the commencement of such proceedings, or at the time the property is otherwise acquired, the amount then remaining to credit of Grantor under (a) of paragraph 2 preceding, as a credit on the interest accrued and unpaid and the balance to the principal then remaining unpaid on said note.

6. Such expenses and fees as may be incurred in the protection of said premises, including the fees of any attorney employed by the Grantee for the collection of any or all of the indebtedness hereby secured, or foreclosure by Grantee's sale, or court proceedings or in any other litigation or proceeding affecting said premises, and attorneys' fees reasonably incurred in any other way, shall be paid by the Grantor.

8. He [Grantor] will continuously maintain hazard insurance, of such type or types and amounts as the Grantee may from time to time require, on the improvements now or hereafter on said premises, and except when payment for all such premiums has theretofore been made under (a) of paragraph 2 hereof, will pay promptly when due any premiums therefor. All insurance shall be carried in companies approved by Grantee and the policies and renewals thereof shall be held by Grantee and have attached thereto loss payable clauses in favor of and in form acceptable to the Grantee ...

10. Grantee may perform any defaulted covenant or agreement of Grantor to such extent as Grantee shall determine, and any moneys advanced by Grantee for such purposes shall bear interest at the rate provided for in the principal indebtedness, shall thereupon become a part of the indebtedness secured by this instrument, ratably and on a parity with all other indebtedness secured hereby, and shall be payable thirty (30) days after demand.

Mr. Telfair filed for chapter 13 protection on December 7, 1992. His plan was confirmed on May 3, 1993. Thereafter, First Union assessed Mr. Telfair attorney fees and expenses for First Union's filing motions to lift the stay of 11 U.S.C. § 362(a) on June 19, 1995, July 31, 1995, and May 20, 1996, due to Mr. Telfair's failure to make payment when due under the Chapter 13 plan and loan documents. First Union applied the payments received from the Chapter 13 trustee and the Telfairs to these fees and expenses, thus leaving a delinquency upon the completion of plan payments and Mr. Telfair's discharge. This caused the Telfairs to be in default, and First Union notified them of the pending foreclosure on their home. The Telfairs filed this adversary proceeding on September 23, 1997 seeking to obtain injunctive and equitable relief claiming a violation of 11 U.S.C. § 506(b) in collecting attorney fees and expenses without court approval, violation of the automatic stay of 11 U.S.C. § 362(a), and violation of the discharge injunction of 11 U.S.C. §§ 524 and 1328. Count two alleges First Union breached its fiduciary duties to Mr. Telfair subsequent to the bankruptcy filing by profiting from escrow funds of Mr. Telfair placed in trust with First Union as trustee or agent. First Union force placed the Telfairs' insurance without notifying Mr. Telfair and received profits from such act, which is prohibited under O.C.G.A. §§ 10–6–24 and 10–6–25.

Mr. Telfair's first count seeks a determination that a secured creditor in a chapter 13 case cannot, without having attorney's fees and expenses allowed by the bankruptcy court under 11 U.S.C. § 506(b) [3], add its postpetition attorneys fees and expenses to the debt of a debtor or use postpetition payments made to the creditor to pay those unallowed fees and expenses. Mr. Telfair alleges a debtor's earnings subsequent to the filing constitute property of the estate under 11 U.S.C. § 1306(a)(2); First Union took property of the estate to pay unauthorized fees and expenses in violation of 11 U.S.C. § 362(a)(3); and First Union's violation of 11 U.S.C. §§ 506 and 362(a)(3), by not applying the payments to principal and interest on the loan, caused Mr. Telfair irreparable harm due to the foreclosure of his home. First Union responds that Mr. Telfair does not have a claim under 11 U.S.C. § 506(b), because the section is inapplicable to attorney fees and expenses which arise postconfirmation, and 11 U.S.C. § 1322(b)(2) [4] and the Security Deed solely apply postconfirmation.

The United States Supreme Court in *Rake v. Wade*, 508 U.S. 464, 113 S.Ct. 2187, 124 L.Ed.2d 424 (1993), held that § 506(b) only establishes the amount of an allowed preconfirmation secured claim, to the extent provided for under the applicable security agreement and note terms.

Under § 506(b) the holder of an oversecured claim is allowed interest on his claim to the extent of the value of the collateral. Section 506(b) "directs that postpetition interest be paid on *all* oversecured claims," *[U.S. v.] Ron Pair*, 489 U.S., [235] at 245, 109 S.Ct., [1026] at 1032 [(1989)] (emphasis added), and, as the parties acknowledge, such interest accrues as part of the allowed claim from the petition date until the confirmation or effective date of the plan.... The arrearages owed on the mortgages held by respondent are plainly part of respondent's oversecured claims. Under the unqualified terms of § 506(b), therefore, respondent is entitled to preconfirmation interest on these arrearages. Where the statutory language is clear, our " 'sole function ... is to enforce it according to its terms.' " *Ron Pair, supra*, at 241, 109 S.Ct., at 1030 (quoting *Caminetti v.*

---

**3.** 11 U.S.C. § 506(b). Determination of secured status (b) To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose.

**4.** 11 U.S.C. § 1322(b)(2) provides:
(b) Subject to subsections (a) and (c) of this section, the plan may—
(2) modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence, or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims; ....

*United States*, 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1917)). Accord, *Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 253–254, 112 S.Ct. 1146, 1149–1150, 117 L.Ed.2d 391 (1992).... Construing §§ 506(b) and 1322(b)(5) together, and giving effect to both, we conclude that § 1322(b)(5) authorizes a debtor to cure a default on a home mortgage by making payments on arrearages under a Chapter 13 plan, and that where the mortgagee's claim is oversecured, § 506(b) entitles the mortgagee to preconfirmation interest on such arrearages.

*Rake v. Wade*, 508 U.S. at 471–72, 113 S.Ct. at 2291–92, 124 L.Ed.2d 424. Section 506(b) is not a limitation on the allowance of attorney fees and expenses postconfirmation and predischarge nor does it authorize such fees postconfirmation. Simply put, § 506(b) has no application to claimed postconfirmation attorneys fees and expenses. Plaintiff's cause of action cannot be sustained under § 506(b).

 Mr. Telfair also argues First Union violated the § 362[5] stay in failing to obtain court approval before applying collected payments to attorney fees and expenses. I previously held in *In re McKnight*, 136 B.R. 891 (Bankr.S.D.Ga.1992), that all property revests in the debtor upon confirmation and that only the postconfirmation earnings of the debtor used for payment under the plan remain property of the estate. Mr. Telfair's postconfirmation earnings used for payments made pursuant to his Chapter 13 plan are property of the estate until paid to the creditor pursuant to the plan. The confirmed plan, as it pertains to First Union, provided that "Debtor shall make regular post-petition payments as they become due to creditors (named below) holding security interests in Debtor's residence. Any claim filed for pre-petition arrearage on such obligation shall be paid by distributions from the Chapter 13 Trustee. First Union Mortgage...." The Security Deed provides in paragraph 6 that

> [s]uch expenses and fees as may be incurred in the protection of said premises, including the fees of any attorney employed by the Grantee for the collection of any or all of the indebtedness hereby secured ... and attorneys' fees reasonably incurred in any other way, shall be paid by the Grantor.

The Security Deed and state law govern the allowance of attorney fees postconfirmation, not § 506(b). This deed provides First Union with authorization to assess and collect attorney fees. Mr. Telfair's counsel raises for the first time in brief opposing summary judgment that if § 506(b) is not applicable, First Union must in any event comply with the State law ten-day notice requirement under O.C.G.A. § 13–1–11[6] before assessing

---

5. 11 U.S.C. § 362(a).

(a) Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title [11], or an application filed under section 5(a)(3) of the Securities Investor Protection Act of 1970, operates as a stay, applicable to all entities, of—

(1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;

(2) the enforcement, against the debtor or against property of the estate, of a judgment obtained before the commencement of the case under this title;

(3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate;

(4) any act to create, perfect, or enforce any lien against property of the estate;

(5) any act to create, perfect, or enforce against property of the debtor any lien to the extent that such lien secures a claim that arose before the commencement of the case under this title;

(6) any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title;

(7) the setoff of any debt owing to the debtor that arose before the commencement of the case under this title against any claim against the debtor; and

(8) the commencement or continuation of a proceeding before the United States Tax Court concerning the debtor.

6. O.C.G.A. § 13–1–11 provides:

(a) Obligations to pay attorney's fees upon any note or other evidence of indebtedness, in addition to the rate of interest specified therein, shall be valid and enforceable and collectible as a part of such debt if such note or other evidence of indebtedness is collected by or through an attorney after maturity, subject to the following provisions:

attorney's fees upon default by a debtor and applying payment received from a debtor to these fees. Assuming that First Union was required to provide the notice under O.C.G.A. § 13–1–11 and failed to do so, there was no § 362 stay violation. Mr. Telfair made payments to First Union as required under his confirmed plan. The application of those payments once received by First Union may have violated state law but did not violate federal bankruptcy law. Bankruptcy Code § 362(a)(1), (2), (5), (6) & (7) prohibit conduct to enforce a prepetition debt. In this case the complained of attorneys fees collected by First Union were assessed postpetition. Section 362(a)(8) involves proceedings before the tax court and are clearly inapplicable. Section 362(a)(3) & (a)(4) prohibit postpetition actions against property of the estate. Postconfirmation the only property of the estate remaining is the debtor's postconfirmation earnings used as payments pursuant to the plan. However, once the payment is made, that is tendered to the creditor pursuant to the plan, the payment is no longer property of the estate. The payment becomes property of the creditor. Whether the creditor properly applied the payment is purely a question of state law. Section 362(a) has nothing to do with that application. There is no § 362(a) stay·violation.

■ Mr. Telfair also asserts that First Union's application of postconfirmation payments to postconfirmation attorney's fees and expenses violated the discharge of 11 U.S.C. § 1328 and discharge injunction of 11 U.S.C. § 524. Neither provision is applicable here. Bankruptcy Code § 1328(a)(1) provides in part relevant to this case

(a) As soon as practicable after completion by the debtor of all payments under the plan, unless the court approves a written waiver of discharge executed by the debtor after the order for relief under this chapter, the court shall grant the debtor a discharge of all debts provided for by the plan or disallowed under section 502 of this title, except any debt—

(1) provided for under section 1322(b)(5) of this title. . . .

Bankruptcy Code § 524(a) provides in part relevant to this case

(a) A discharge in a case under this title—

(1) voids any judgment at any time obtained, to the extent that such judgment is a determination of the personal liability of the debtor with respect to any debt discharged under section . . . 1328 of this title, whether or not discharge of such debt is waived;

(2) operates as an injunction against the commencement or continuation of any action, the employment. of process, or any act, to collect, recover or offset any such debt as a personal liability of the debtor, whether or not discharge of such debt is waived. . . .

The complained of debt, postconfirmation attorney's fees, was not a debt provided for under the debtor's plan nor allowed under

(1) If such note or other evidence of indebtedness provides for attorney's fees in some specific percent of the principal and interest owing thereon, such provision and obligation shall be valid and enforceable up to but not in excess of 15 percent of the principal and interest owing on said note or other evidence of indebtedness;

(2) If such note or other evidence of indebtedness provides for the payment of reasonable attorney's fees without specifying any specific percent, such provision shall be construed to mean 15 percent of the first $500.00 of principal and interest owing on such note or other evidence of indebtedness and 10 percent of the amount of principal and interest owing thereon in excess of $500.00;

(3) The holder of the note or other evidence of indebtedness or his attorney at law shall, after maturity of the obligation, notify in writing the maker, endorser, or party sought to be held on said obligation that the provisions relative to payment of attorney's fees in addition to the principal and interest shall be enforced and that such maker, endorser, or party sought to be held on said obligation has ten days from the receipt of such notice to pay the principal and interest without the attorney's fees. If the maker, endorser, or party sought to be held on any such obligation shall pay the principal and interest in full before the expiration of such time, then the obligation to pay the attorney's fees shall be void and no court shall enforce the agreement. The refusal of a debtor to accept delivery of the notice specified in this paragraph shall be the equivalent of such notice.

(b) Obligations to pay attorney's fees contained in security deeds and bills of sale to secure debt shall be subject to this Code section where applicable.

§ 502. Relative to First Union the debtor's plan requires the debtor to "make regular post-petition payments as they become due" and requires the filing of a claim "for prepetition arrearage on such obligation [to be] paid by distributions from the Chapter 13 Trustee." The plan does not provide for the payment of postpetition debt other than regular monthly payments. Additionally, the discharge of § 1328(a) specifically excludes any debt provided for under § 1322(b)(5),[7] which provision applies to the treatment of the debt due First Union under the debtor's plan. The debtor's plan does not provide for postpetition debt due First Union other than the regular monthly payments and the discharge does not affect the debt due First Union pursuant to § 1322(b)(5). As the discharge does not affect the debt due First Union, the discharge injunction of § 524 has no application. Having found that Mr. Telfair's claim for inappropriately collected attorney fees and expenses in violation of § 506(b) and/or § 362(a) and/or § 524 and § 1328 does not survive First Union's motion for summary judgment, Mr. Telfair's motion for class certification is denied.

Count two of Mr. Telfair's claim asserts that the Telfairs placed money into an escrow account of which First Union became a trustee or agent, creating a fiduciary duty; First Union force placed the Telfairs' insurance postpetition using the escrow funds which were property of the estate, resulting in higher premiums for the Telfairs and a breach of fiduciary duty by First Union in receiving a commission for the act. Further, O.C.G.A. §§ 10–6–24 and 10–6–25 [8] notice and profit requirements on agents were violated by this conduct. First Union responds that no fiduciary duty is established when a mortgagee requires a mortgagor to place in escrow enough money to pay insurance, taxes and other costs that would come due on the property. The issue is whether the escrow account created a trust or agency relationship, thus placing a fiduciary duty on First Union regarding its handling of the escrowed money. It does not.

■ Mr. Telfair's first argument that a trust was created when First Union as mortgagee required the Telfairs as mortgagor to place in escrow sums to pay taxes, insurance and other costs pursuant to the VA-approved mortgage was addressed by the United States Court of Appeals for the Seventh Circuit. In analyzing a VA-approved mortgage with essentially the same language the court sought to determine "whether the mortgages create trusts requiring the defendant as trustee to account to the mortgagors as beneficiaries for any benefits the defendant may derive from use of the monthly payments." *Judd v. First Fed. Sav. & Loan Ass'n of Indianapolis,* 710 F.2d 1237, 1241 (7th Cir. 1983). The court held in relevant part:

We again conclude that the district court was correct; despite the scattered use of the words "trust" and "trustee," and the phrase "in trust," the mortgages do not transform a traditional debtor-creditor relationship into a fiduciary relationship.

The plaintiffs' argument is not new. Others have claimed that mortgage instruments—similar or identical to the V.A. form mortgage used here—created trusts for management of monthly payments. And those claims have been defeated regularly. *See, e.g., Kronisch,* and cases cited therein; *see also LaThrop v. Bell Federal Savings & Loan Ass'n.,* 68 Ill.2d 375, 12 Ill.Dec. 565, 370 N.E.2d 188 (1977), cert. denied, 436 U.S. 925, 98 S.Ct. 2818, 56 L.Ed.2d 768 (1978); *Brooks v. Valley Na-*

---

**7.** 11 U.S.C. § 1322(b)(5) provides
(b) Subject to subsections (a) and (c) of this section, the plan may—...
(5) notwithstanding paragraph (2) of this subsection, [see footnote 4] provide for the curing of any default within a reasonable time and maintenance of payments while the case is pending on any unsecured claim or secured claim on which the last payment is due after the date on which the final payment under the plan is due....

**8.** O.C.G.A. § 10–6–24 & 25 provide:

O.C.G.A. § 10–6–24. Agent not to buy or sell for himself. Without the express consent of the principal after a full knowledge of all the facts, an agent employed to sell may not himself be the purchaser; and an agent to buy may not himself be the seller.
O.C.G.A. § 10–6–25. Agent must account for profit from principal's property.
The agent shall not make a personal profit from his principal's property; for all such he is bound to account.

*tional Bank,* 113 Ariz. 169, 548 P.2d 1166 (1976); *Carpenter v. Suffolk Franklin Savings Bank,* 370 Mass. 314, 346 N.E.2d 892 (1976).

Simply stated, the words used in a document are not always conclusive evidence of a trust. The principal consideration is intent. *See, e.g., Dixon v. White,* 327 F.2d 434 (7th Cir.1964) (Indiana law; plaintiff failed to prove that parties intended an express trust rather than merely a debtor-creditor relationship). Several factors indicate establishment of a debt rather than creation of a trust. If the monthly payments here are insufficient to cover first the sums due for taxes and insurance, and second the monthly loan debt, then the mortgagors are in default. There are no expressed restrictions on the mortgagee's use of the monthly payments until the liability arises to pay insurance and taxes. Additionally, none of the parties ever manifested an intention to create a trust other than by signing a form document. . . .

[T]erms indicated that the monthly advance payments were part of the mortgage debt, and not trust contributions. . . . [T]he mortgage here, provided that a failure to make those payments constituted default. This clearly indicated that the bank required the advance payments as additional security for the mortgage debt. 161 N.J.Super. at 597, 392 A.2d at 180. *See LaThrop,* 68 Ill.2d at 383–84, 370 N.E.2d at 192. We . . . hold that the mortgages between the plaintiffs and the defendant created debts, not trusts. . . .

The mortgage instruments here establish standard debtor-creditor relationships; they neither imply special deposits nor create trusts for handling the required monthly advance payments.

*Judd,* 710 F.2d at 1241–43. While the Seventh Circuit was analyzing whether the mortgagee must account to the mortgagor for interest earned on the escrow account, this holding extends to the situation in the present case. Per the *Judd* holding, a trust was not created by the Telfairs' deposit of money into an escrow account or by the inclusion of the "trust" and "trustee" language within the Security Deed. Furthermore, Georgia case law finds no fiduciary duty on a mortgagee of escrowed funds. *Moore v. Bank of Fitzgerald,* 225 Ga.App. 122, 126, 483 S.E.2d 135, 139 (1997) ("[T]here is 'particularly no confidential relationship between lender and borrower or mortgagee and mortgagor for they are creditor and debtor with clearly opposite interests.' "); *Knight v. First Fed. Sav. & Loan Ass'n,* 151 Ga.App. 447, 260 S.E.2d 511, 515 (1979) ("The majority rule appears to be that funds paid by a mortgagor to an escrow account to be used by the mortgagee to meet tax and insurance obligations upon the property as they accrue do not constitute trust properties such as would render the mortgagee accountable to the mortgagor for any earnings or profits from the funds. Annot., Rights in Escrow Funds for Taxes, § 3, 50 A.L.R.3d 697, 701 (1973). Under the same reasoning, we conclude that there is no requirement as a matter of law for the lender to pay the borrower interest on funds escrowed for valid business reasons such as a reserve for the replacement of deteriorating equipment."). Mr. Telfair also asserted that an implied trust arose upon his placing money in the escrow account. Pursuant to the *Judd, Moore,* and *Knight* cases a trust did not arise in this situation, because the nature of the relationship was debtor-creditor. No distinction is made by the Georgia courts between express and implied trusts in this situation, thus this rationale extends to any claimed trust. *Knight,* 151 Ga.App. 447, 260 S.E.2d at 515.

■ Mr. Telfair's second argument is that a fiduciary duty arose on the mortgagee when the escrow account formed because the mortgagee became the agent for the mortgagor, thus creating an agency relationship. First Union denies that the mortgagor-mortgagee relationship creates an agency relationship. Therefore, according to First Union no fiduciary duty arose. O.C.G.A. § 10–6–1 determines under Georgia law when an agency relationship arises.

The relation of principal and agent arises wherever one person, expressly or by implication, authorizes another to act for him or subsequently ratifies the acts of another in his behalf.

O.C.G.A. § 10–6–1. Georgia and federal courts interpreting this section adopt a narrow interpretation.

Section 1 of the *Restatement (Second) of Agency* defines agency as "the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf *and subject to his control*, and consent by the other so to act." (Emphasis added.) Despite arguably more general language in Georgia Code § 4–101 [currently O.C.G.A. § 10–6–1], the Georgia courts have adopted this definition, including the element of control. *Smith v. Merck,* 206 Ga. 361, 57 S.E.2d 326 (1950); *Washington National Insurance Co. v. Mayor,* 196 Ga. 126, 26 S.E.2d 359 (1943); *Hampton v. McCord,* 141 Ga.App. 97, 232 S.E.2d 582 (1977).

*Flournoy v. City Finance of Columbus, Inc.,* 679 F.2d 821, 823–24 (11th Cir.1982) (bracketed information added) (emphasis in original).

Under the Security Deed no control was retained by the Telfairs over First Union's use of the escrow funds. Instead, First Union is given the ultimate decision in how the funds are to be used upon the Telfairs' default, and the Telfairs had no control over the use. Furthermore, the Security Deed in effect provides that the money is to be placed in escrow for the benefit of First Union to insure the payment of taxes, insurance and other costs, not the Telfairs. Under the Security Deed, the Telfairs agreed to pay on a monthly basis money to First Union to be held by First Union to pay taxes encumbering the property and insurance covering the collateral securing the Telfairs' debt to First Union. Only a debtor-creditor relationship was created. Additionally, the escrow funds constituted additional security for the debt, which under the terms of the Security Deed, included attorneys fees incurred by First Union. This does not establish an agency relationship and, therefore, no fiduciary duty exists. First Union's motion for summary judgment is granted as to count two of the complaint, and Mr. Telfair's motion for class certification is denied.

It is, therefore, ORDERED that First Union's Motion for Summary Judgment on the complaint is granted, and

It is further ORDERED that Mr. Telfair's Motion for Class Certification is denied.